UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                Plaintiff,

      v.                                               Case No. 22-CV-706

MEGAN LEBERAK, et al.,

                Defendants.

## DECISION AND ORDER

Plaintiff Timothy Durley, who is representing himself and confined at Waupun Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Durley was allowed to proceed on claims under the Eighth Amendment for deliberate indifference, wherein he alleges that the defendants, Megan Leberak and Cheryl Jeanpierre, failed to address injuries he allegedly sustained when he fell and hit his head on March 20, 2022.

The defendants have filed a motion for summary judgment. (ECF No. 31.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 5, 18.)

1. **Facts**

The facts are drawn in large part from the defendants' proposed findings of fact (ECF No. 33). Although Durley responded to the defendants' proposed findings of fact

(ECF No. 50), many of his responses do not point to evidence supporting his contentions. As to the proposed findings of fact which Durley did not properly contest, they are deemed admitted for purposes of deciding the motion for summary judgment. However, the court notes that Durley submitted a declaration in his response materials, and that he invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into an affidavit for purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). As such, the court will consider the information contained in Durley's submissions where appropriate in deciding the motion for summary judgment.

At all relevant times Durley was incarcerated at Waupun Correctional Institution ("Waupun"). (ECF No. 33, ¶ 1.) Defendant Cheryl Jeanpierre was a physician working at Waupun. (*Id.*, ¶ 2.) Defendant Megan Leberak is a nurse at Waupun. (*Id.*, ¶ 4.)

Durley's claims arise out of a head injury he alleges he sustained when he fell and hit his head in his cell on March 20, 2022. Four days before Durley's fall, on March 16, 2022, he began a hunger strike. (ECF No. 33, ¶ 12.) The defendants have provided a comprehensive summary of Durley's medical records related to his fall as well as his hunger strike. Those records indicate that Durley submitted to the Health Services Unit ("HSU") various Health Service Requests ("HSRs") related to his fall, his hunger strike, and related symptoms. (*Id.*, ¶¶ 16, 17, 20, 28, 30, 31, 34, 35, 44, 45, 51, 52, 54, 57, 58, 59, 61.) He was seen by various HSU staff members regarding his hunger strike, and once for complaints related to his fall. (*Id.*, ¶¶ 13, 15, 22, 32, 36, 40, 46, 56.) The court will only

discuss those HSRs and visits with HSU staff that are relevant to his Eighth Amendment claims against Jeanpierre and Leberak for purposes of deciding the motion for summary judgment.

On March 16, 2022, the day he began his hunger strike, Durley was seen twice by HSU staff, once with Defendant Leberak, for complaints related to Durley's belief that he had been poisoned. (ECF No. 33, ¶¶ 13, 15.)

On March 20, 2022, Leberak saw Durley for a hunger strike assessment. (ECF No. 33, ¶ 22.) When Durley was getting up to go to his assessment, he fell. (*Id.*) The records documenting Leberak's assessment indicate that she was told that Durley had fallen, but the defendants state that no one (including Durley) reported that he hit his head or that he lost consciousness when he fell. (*Id.*; ECF 36-1 at 5.)

The defendants also state that, at the assessment with Leberak, Durley did not report any pain from the fall. (ECF No. 33, ¶ 22.) Leberak found that Durley's vitals were stable and did not observe any signs of head trauma. (*Id.*) Because Durley did not report pain from falling, Leberak did not discuss pain medication or other pain relievers with him. (*Id.*, ¶ 24.)

Durley states that when he fell he hit his head on his cell door, although he does not dispute that he did not lose consciousness. (ECF No. 50, ¶ 22.) He also states that during the hunger strike assessment with Leberak he told her that he fell and hit his head and that he was experiencing migraines as a result. (*Id.*; ECF No. 1 at 4.) According to

Durley, Leberak told him to use his already-prescribed pain medications of Excedrin and Ibuprofen, which Durley had access to because he had a history of suffering from headaches. (*Id.*; ECF No. 33 at ¶¶ 27, 50.) Durley states that, although he told Leberak that those medications had not helped with headaches in the past, she did not provide an alternative. (ECF No. 1 at 4.)

Four days later, on March 24, 2022, HSU received another HSR from Durley in which he stated that he might have fractured his head or might have internal bleeding because of his fall, and requested an examination as well as a CT scan or x-ray. (ECF No. 33, ¶ 34.) Nondefendant Nurse York forwarded this HSR to Jeanpierre, who responded that she acknowledged Durley's request and indicated that he was scheduled to see Jeanpierre that day. (*Id.*)

Indeed, Jeanpierre saw Durley on March 24, 2022, for a hunger strike assessment. (ECF No. 33, ¶ 36.) They discussed Durley's hunger strike and that he had started eating again. He also reported that he was coughing up blood, which prompted Jeanpierre to order an x-ray of his stomach. (*Id.*)

According to the defendants, in his assessment with Jeanpierre Durley did not report having headaches, migraines, or nosebleeds, nor did Jeanpierre observe any signs of head trauma. (ECF No. 33, ¶ 37.) Jeanpierre did not discuss pain medication with Durley, nor did Durley ask for an ice bag. (*Id.*) Jeanpierre determined that ordering a CT

scan or x-ray of Durley's head was unnecessary based on prior nurse visit reports indicating that Durley did not exhibit signs or symptoms of head trauma. (*Id.*, ¶ 38.)

Durley states that he *did* tell Jeanpierre that he was experiencing headaches, migraines, and nosebleeds after hitting his head when he fell on March 20, 2022. (ECF Nos. 50, ¶ 38, 1 at 5.) He says that Jeanpierre told him he could take his already-prescribed pain medications, Excedrin and Ibuprofen; when he told her those had not alleviated similar symptoms in the past, she told him she would not prescribe him anything else and if he had a problem with that, he could file a lawsuit against her. (*Id.*)

Two days later, on March 26, 2022, Leberak saw Durley for another hunger strike assessment. (ECF No. 33, ¶ 40.) Durley did not report experiencing headaches, migraines, or nosebleeds. *Id.* Durley's hunger strike monitoring was discontinued on March 27, 2022. (ECF No. 33, ¶ 41.)

On March 28, 2022, HSU received three HSRs from Durley. (ECF No. 33, ¶ 44.) Two pertained to his ongoing stomach issues. (*Id.*, ¶ 45.) In the other he requested a CT scan due to hitting his head on March 20, 2022, stating that Leberak had not done anything for him and that he was having severe pain—specifically, headaches and nosebleeds. (*Id.*) Nondefendant Nurse Vick responded to the HSR and scheduled a nurse visit. (*Id.*, ¶ 44.)

On March 30, 2022, nondefendant Nurse Bleecker saw Durley based on an HSR in which he complained of an increase in headaches and nosebleeds since he fell. (ECF No.

33, ¶ 46.) He reported that his headaches lasted three to six hours a day, varied in location and intensity, and would stop and start frequently during the day. (*Id.*) Durley stated that Excedrin and Ibuprofen did not help his headaches. With respect to his nosebleeds, he reported small amounts of bleeding. (*Id.*) Nurse Bleecker sent Jeanpierre an email stating that Durley had been seen and was complaining of headaches and nosebleeds since his fall and asked Jeanpierre to review her nursing visit note. (*Id.*, ¶ 47.) Although Durley's chart does not contain a response from Jeanpierre to Nurse Bleecker, Jeanpierre states that she would have reviewed Durley's chart and responded to Nurse Bleecker if asked. (*Id.*, ¶ 48.)

A couple of weeks later, on April 14, 2022, HSU received an information request from Durley regarding an appointment the day before for x-rays of his abdomen and chest ordered by Nurse Moore and Jeanpierre. (ECF No. 33, ¶¶ 54, 32, 36.) Durley stated that he wanted an x-ray of his head, but the x-rays that were scheduled were for his abdomen and chest. (*Id.*, ¶ 54.) Jeanpierre responded to the information request and explained to Durley that his x-rays had been cancelled because he had refused them multiple times. (*Id.*, ¶ 55.) The defendants explain that Jeanpierre would not have scheduled an x-ray for Durley's head because he did not exhibit any symptoms of head trauma and no x-ray was warranted. (*Id.*) Nevertheless, it does not appear that Jeanpierre addressed Durley's request for a head x-ray in her response to his HSR.

## 2. Summary Judgment Standard

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d

7
Case 2:22-cv-00706-WED   Filed 02/22/24   Page 7 of 16   Document 60

410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

3. Analysis

3.1. Eighth Amendment

Durley claims that Leberak and Jeanpierre violated his Eighth Amendment rights by refusing to take any action to treat his headaches, migraines, and nosebleeds after his fall besides telling him to take his already-prescribed pain medications, which Durley told them did not alleviate his symptoms. Durley also claims that Jeanpierre violated his Eighth Amendment rights by refusing to provide him with a CT scan or x-ray of his head.

The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain' including ... grossly inadequate medical care.'" *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2015) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Courts "use a two-part test to determine if medical care amounted to cruel and unusual punishment ... 'whether the plaintiff suffered from an objectively serious medical condition' and 'whether the individual defendant was deliberately indifferent to that condition.'" *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016)).

3.1.1. Objectively Serious Medical Need

"A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay

person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

The parties dispute whether Durley suffered from an objectively serious medical condition. The Seventh Circuit has held that "any injury to the head unless obviously superficial should ordinarily be considered serious." *Sheppard v. Ludwig*, No. 20-3531, 2021 WL 3161080 (7th Cir. July 27, 2021) (quoting *Murphy v. Walker*, 51 F.3d 714, 719 (7th Cir. 1995)). Durley alleges that he fell, hit his head on the door of his cell, and experienced headaches, migraines, and nosebleeds as a result. A reasonable factfinder could conclude that Durley's head injury and symptoms constituted an objectively serious medical need. *See Caffey v. Maue*, 679 F. App'x 487, 491 (7th Cir. 2017) (citing *Dobbey v. Mitchell–Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015); *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008) ("Since Caffey had just been struck on the head and was experiencing pressure, ringing, and sharp, recurring pain, we can assume for purposes here that he suffered from an objectively serious medical condition.")).

### 3.1.2. Deliberate Indifference

Turning to the issue of whether the defendants were deliberately indifferent, the plaintiff "must provide evidence that an official *actually* knew of and disregarded a

substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original). That requires showing that the official had "'a subjective state of mind' somewhere between negligence and intention.'" *Id.*

When a plaintiff brings a claim of deliberate indifference against a medical professional, he must show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021). In other words,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

*Id.*

The defendants argue that no reasonable factfinder could find that they were deliberately indifferent to Durley's medical needs because both Leberak and Jeanpierre exercised reasonable professional judgment in deciding what care was needed to address his complaints. (ECF No. 32 at 22.)

### 3.1.2.1. Defendant Leberak

It is undisputed that Leberak saw Durley for a hunger strike assessment on March 20, 2022, during which she was informed that Durley had fallen while getting up to go to his assessment with her. Leberak was told that Durley had not lost consciousness, and

10
Case 2:22-cv-00706-WED   Filed 02/22/24   Page 10 of 16   Document 60

she reported that his vitals were stable and did not observe any signs of head trauma during the exam. According to the defendants, Durley did not mention hitting his head when he fell, nor did he complain of any migraines, pain, or other symptoms because of the fall.

Durley says that he *did* tell Leberak he hit his head on the cell door and that he was experiencing migraines as a result. Durley also says that, in response, Leberak told him to use his already-prescribed medications of Excedrin and Ibuprofen, and that she did not offer an alternative option when Durley told her that those medications did not alleviate his symptoms.

Taking the facts in the light most favorable to Durley, no reasonable factfinder could conclude that Leberak was deliberately indifferent to Durley's medical needs. As stated above, the court is to defer to Leberak's treatment decision unless Durley shows that Leberak's decision was "so inadequate as to demonstrate an absence of professional judgment." *Stewart*, 14 F.4th at 763. Durley has not offered any evidence that Leberak's conduct was so inadequate that it demonstrates an absence of professional judgment. The record demonstrates that, during her assessment of Durley, Leberak exercised her professional judgment in determining that no additional treatment was needed after she was informed that Durley had not lost consciousness when he fell, she found his vitals to be stable, and she observed no signs of head trauma.

The only other time Leberak saw Durley after his fall was on March 26, 2022, and she would not have had a reason to treat him for headaches, migraines, or nosebleeds related to his fall because he did not report experiencing any symptoms on that date.

### 3.1.2.2. Defendant Jeanpierre

It is undisputed that Jeanpierre became aware of Durley's fall and related complaints of headaches, migraines, and nosebleeds on March 24, 2022, when she was forwarded an HSR in which Durley reported that he might be suffering from a head fracture or internal bleeding because of his fall. Jeanpierre saw Durley that same day for a hunger strike assessment. According to the defendants, Durley did not complain of any headaches, migraines, nosebleeds, or other symptoms related to his fall.

However, Durley maintains that he *did* tell Jeanpierre he was experiencing headaches, migraines, and nosebleeds after hitting his head. Durley asserts that Jeanpierre told him he could take Excedrin and Ibuprofen and that she would not prescribe additional medication when he told her that those medications did not alleviate his symptoms.

Taking the facts in the light most favorable to Durley, no reasonable factfinder could conclude that Jeanpierre was deliberately indifferent to Durley's medical needs. Again, Durley must demonstrate that Jeanpierre's treatment was "so inadequate as to demonstrate an absence of professional judgment." Assuming Durley did tell Jeanpierre that he had hit his head and was experiencing headaches, migraines, and nosebleeds, that

Jeanpierre told him to take Excedrin and Ibuprofen, and that she did not provide an alternative when Durley told her those medications did not help, Durley has failed to offer any evidence that Jeanpierre's treatment was so inadequate that it demonstrates an absence of professional judgment. The record demonstrates that, after observing that Durley did not exhibit signs of head trauma, Jeanpierre determined that additional treatment was not necessary.

Nor could a reasonable factfinder conclude that Jeanpierre's decision not to order a CT scan or x-ray despite Durley's subsequent complaints was deliberately indifferent to Durley's medical needs. It is undisputed that, after Jeanpierre's visit with Durley on March 24, 2022, the next time she was informed that Durley was complaining about his head was on March 30, 2022, when Nurse Bleecker emailed her that Durley had been seen and was complaining of an increase in headaches and a new onset of nosebleeds since his fall. Although Jeanpierre does not recall whether she responded to Nurse Bleecker, she explains she would not have ordered imaging in the absence of any evidence of head trauma.

The only other time Jeanpierre was made aware of Durley's head-related complaints was on April 14, 2022, when she received an HSR in which Durley questioned why he was scheduled for an x-ray of his chest and stomach when he wanted an x-ray of his head. While Jeanpierre in her response did not explain to Durley why she had not

ordered imaging of his head, she again states that imaging was not medically warranted at that point because there was no sign of head trauma.

Durley has produced no evidence showing that Jeanpierre's decision not to order a CT scan or x-ray of Durley's head lacked professional judgment. The record reflects the opposite: each time Jeanpierre was informed that Durley was complaining of symptoms related to his fall, she exercised professional judgment in determining that imaging of Durley's head was not medically warranted based on the absence of any signs of head trauma during Durley's various visits with HSU staff.

Furthermore, neither of Durley's claims amount to situations where the defendants "doggedly persist[ted] in a course of treatment known to be ineffective." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations omitted). At most Durley demonstrates that he did not receive the care he wanted, but that is not a basis for a constitutional claim. *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (holding that disagreement with a doctor's medical judgment is insufficient to support an Eighth Amendment claim). *See also Christopher v. Liu*, 861 F. App'x 675, 679-80 (7th Cir. 2021) (citing *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)) ("[T]he Eighth Amendment does not give prisoners the right to demand specific medical treatment…."). Because no reasonable jury could conclude that the defendants acted with deliberate indifference to Durley's medical needs, they are entitled to summary judgment.

### 4. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment on Durley's claims under the Eighth Amendment is **granted**. The defendants also argue that they are entitled to qualified immunity, but because the court is granting summary judgment in their favor on the merits it need not address that argument. Because there are no remaining claims, the case is dismissed.

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment (60 days if one of the parties is, for example, the United States, a United States agency, or a United States officer or employee sued in an official capacity). *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment

under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 22nd day of February, 2024.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge